GEORGIA NORTHERN RAILWAY COMPANY *v.* CITY OF MOULTRIE.

1. In order to authorize a municipal corporation to take, for the purpose of opening or extending streets, property already devoted to public use, the power must be conferred in express terms, or by necessary

Eminent Domain, 20 C. J. p. 537, n. 55; p. 602, n. 93.

implication. And this is true also where it is proposed to take property already devoted to a public use, where such taking or second use, and the enjoyment of the same, involves the practical extinguishment of the former, or renders its exercise so inconvenient and hazardous as practically to destroy its value.

2. Applying the principles stated above to the facts of this case, the court erred in refusing an interlocutory injunction.

No. 5705.    JANUARY 13, 1927.

Petition for injunction. Before Judge W. E. Thomas. Colquitt superior court. October 15, 1926.

The Georgia Northern Railway Company brought its petition seeking to enjoin the City of Moultrie from condemning a portion of its right of way in that city. The object and purpose of the condemnation proceeding was to open and extend a street across the right of way, track, and main line of the railway company. In the petition it is alleged, in substance, as follows: At the point at which the city seeks to establish the street across the right of way of the main line of the railway company is located a coalchute owned by the railway company and used by it in connection with the operation of its railroad; and where it is sought to locate the street across the right of way of the railway company is another track of the railway company, which has its beginning in the center of the proposed street and extends north a distance of 230 feet, this last-mentioned track being located upon the embankment which becomes gradually higher for a distance of 230 feet, and at the northern end thereof said embankment and elevated track is 13 feet high, and at the northern end thereof the coalchute is located and has been located and used in connection with its railroad business since the year 1919. The elevated track is used by the railway company for the purpose of conveying coal into its coal-chute, and it was erected at an expense of approximately $7,000. If the establishment of the street and crossing at the south end of the embankment at the point where the elevated track joins the main line of the railway company is permitted, the use of the crossing by the public will be so inconvenient and hazardous to the railway company in the operation of its trains as to destroy the use· of the embankment and track located thereon, as well as its coal-chute located at the end of the embankment and track. This embankment would entirely preclude from the view of its engineers, firemen, and other employees

on its trains, all persons, vehicles, and objects crossing its track over the proposed crossing from the eastern side thereof; and as a consequence flowing directly and proximately from the establishment of the crossing the railway company would be compelled, not only to tear down the embankment, to take up its track, but would be compelled to remove its coal-chute from said point and locate it elsewhere by the building of a similar embankment and laying its track thereon; and on account of the fact that there is no other point on its main line at which there is a steep grade, such as exists at the present location of the coal-chute, the expense of building another coal-chute would cost the railway company not less than $10,000 or $15,000. There is no other convenient place at which petitioner could rebuild a coal-chute on its main line. Just above the north end of the embankment or elevated track, a distance of 700 feet from the crossing which the city proposes to establish, is another public crossing over the right of way and track of the railway company, and all the way from said last-named crossing to the crossing which the city proposes to establish there is a steep hill upon which the main line of petitioner is located, and the crossing which the city now proposes to locate and establish over the right of way and main line is at the top of this hill; and on account of the fact that it is necessary for its engineers, in the operation of its trains upon this track, to put on a heavy load of steam to run over the hill, if the proposed crossing is established on the top of the hill it will be impossible for the company to operate its trains over the crossing with any degree of safety to persons, vehicles, and objects that might be upon the crossing; for if it should become necessary for the railway company to stop its trains at or near the crossing, it would be impossible to pull the train over the crossing without having to back a distance of about 1,000 feet before it could get up power enough to surmount the hill and crossing; and for this reason the placing of said crossing by the city at the point where it is proposed to place it would practically destroy the use of the railway company's track for railroad purposes. There is no public necessity for the crossing; the city's effort to establish it over the company's right of way and main-line track at this particular point is solely upon the request of one citizen who lives just east of the proposed crossing; the crossing is not needed by the public gen-

erally; the one citizen referred to is the only person in the corporate limits of the City of Moultrie who would derive any benefit whatever therefrom, and he would derive only a nominal benefit; he has ingress and egress by roads, thoroughfares, and streets both north, south, and east from his home to any portion of the City of Moultrie; he is the only resident between the proposed crossing and Fifth Street S. E., and is therefore the only person in the City of Moultrie who would be even slightly convenienced by said crossing. The railway company charges, that, while said proceeding on the part of the City of Moultrie purports to be for the benefit of the public generally, its proceeding to condemn the railway company's property was actually begun only at the request of the one person and solely for his personal and private convenience.

At the interlocutory hearing the plaintiff introduced evidence in support of its allegations in the petition. The defendant presented a petition to modify the restraining order which had been previously granted, and introduced evidence in support thereof. After taking the case under advisement, the judge, at the October term, 1925, rendered the following judgment: "Upon consideration of the foregoing case upon the pleadings, it is considered and adjudged that the temporary restraining order heretofore granted be dissolved and the interlocutory injunction is denied. This order is passed, not in the exercise of the discretion vested in the court, but because as a matter of law plaintiff is not entitled to relief asked for." In rendering the judgment none of the evidence was considered, but the judgment was based solely upon the pleadings, which consisted of the petition and the motion to modify. The petitioner excepted.

*J. J. Hill* and *J. O. Gibson,* for plaintiff.

*James L. Dowling,* for defendant.

BECK, P. J. (After stating the foregoing facts.) The judgment rendered by the trial court in this case was equivalent to sustaining a general demurrer to the petition; and we are of the opinion that the petitioner was entitled to an interlocutory injunction restraining the defendant from opening the proposed street until, at a trial, it could be determined, upon evidence duly submitted, whether or not the second use to which the strip of land embraced in the crossing, and which the defendant is attempting to condemn, involves a practical extinguishment of the former

use, or renders its exercise so extremely inconvenient and hazardous as to practically destroy its value for the purpose to which it is devoted by the railway company. It seems that decisions heretofore rendered by this court are practically controlling upon the question here involved. In the case of *City Council of Augusta* v. *Ga. Railroad &c. Co.*, 98 *Ga.* 161 (26 S. E. 499), it was said: "In order to authorize a municipal corporation to take, for the purpose of opening or extending streets, property already devoted to public use, the power must be conferred in express terms, or by necessary implication. A general power conferred by legislative enactment upon a municipal corporation 'to open new streets, change, widen, or to extend streets already opened, within the corporate limits,' does not expressly confer upon the municipality the authority to take and use for this purpose land already in use by a railroad company for purposes embraced within the provisions of its charter." In the course of the opinion rendered in that case it was said: "In sparsely settled communities, it is possible to establish a public way across the track of a railroad company without serious embarrassment to the company in the exercise of its corporate franchises, and in such a way as the second use may be reasonably consistent with the first. If the conditions are such that they may be reasonably made to consist, there is no such encroachment upon the prior public use as even appreciably to impair, much less extinguish it; and therefore, even though some slight inconvenience may result to the prior occupant, there is no reason why a second public use, when granted even in general terms, may not be held to confer upon the public authorities the right in such manner to exercise it. A different result follows, however, when the enjoyment of the second use involves the practical extinguishment of the former, or renders its exercise so extremely inconvenient and hazardous as practically to destroy its value. In such a case, the right to enjoy the second use must rest upon express legislative authority, and will not be implied. The exercise of the second use, under such circumstances, would amount to a forfeiture of the first."

It will be seen, by a reference to the statement of facts, that if the proposed crossing is permitted to be made, the effect of placing the crossing at the point described will either destroy the use of the property by the railway company or seriously impair the

rights of the company to the regular, effective, and profitable use thereof. And we will now inquire whether or not there is legislative grant of power to the City of Moultrie to interfere with the rights of the railway company as they now exist, and to impair them to the extent indicated; that is, whether or not there is express legislative authority given to the city to do this. If such authority is given, it must be found in the act to create a new charter for the City of Moultrie, approved November 20, 1901 (Acts 1901, p. 591). In section 21 of that act it is provided that "The mayor and aldermen shall have full and complete control of and authority over the streets, alleys, and sidewalks of the city, and shall have full power and authority to condemn property for the purpose of opening and laying out new streets and alleys, and for widening, straightening, or otherwise changing the streets, sidewalks, or alleys, and grading the streets, sidewalks, or alleys of the city; and whenever the mayor and aldermen shall desire to exercise the power and authority granted in this section, it may be done whether the land sought to be condemned is in the hands or control of the owner, trustee, executor, administrator, agent, guardian, or other person." We do not think that express legislative authority to open the proposed street, under the facts and circumstances alleged, can be found in the section quoted; and if not found there, it is not in that charter. Nor is there any other section of the act which enlarges this authority relatively to the question we have in hand. That power is not enlarged by the provision in the same section of the act that "In all cases where property sought to be condemned belongs to a railroad or other corporation, the notice to condemn may be served on the nearest agent of such railroad or corporation." The part of the section last quoted merely provides for service in condemnation proceedings. Of course it is to be implied that condemnation proceedings may be maintained against the railroad company, but it is not to be implied from this that condemnation can be had which would result in a practical destruction of the uses to which the strip of land embraced in the crossing had already been devoted. The difference, under the law, which is made in cases of condemnation of strips of land across railroads for the purpose of making a crossing there, where in one case it will practically destroy the former use, and where it is consistent with the former use, is

brought out in decisions rendered by this court. The case of *City Council of Augusta* v. *Ga. R. &c. Co.*, from which we have already quoted, is one such case. And in *Town of Poulan* v. *A. C. L. R. Co.*, 123 *Ga.* 605 (51 S. E. 657), it was said: "Power delegated by the State to a municipal corporation to 'condemn property for the purpose of laying out new streets and alleys, and for widening, straightening, or grading, or in any way changing the street lines and sidewalks of said town,' is sufficiently broad to authorize the condemnation of so much of the right of way of a railroad company as may be necessary for the construction of a street crossing and the extension of a street over such right of way." This is the third headnote in the case referred to. But in the course of the decision it was said: "We do not think the petition in the present case makes such a case of inconsistent uses as, under the decision just cited, would authorize the court to enjoin the exercise by the town of the power to condemn, conferred upon it by the General Assembly. The crossing is to be fifty feet from the company's depot, and traverses only two tracks, the main line and a siding at a small station, and therefore would not seriously interfere with the use of the depot and grounds. The crossing might at times somewhat inconvenience the company in the conduct of its business, and possibly require it to be more circumspect and careful in order to avoid injury to persons using the crossing; but its use is not, under the facts alleged, so inconsistent with the prior appropriation by the company as to destroy, or even seriously impair, the company's right to use its property for the purposes to which it had previously devoted it." It will be seen, from a reading of the foregoing statement, how different the instant case is from that of *Town of Poulan* v. *A. C. L. R. Co.*, supra, taking the situation to be as described in the decision in that case, etc.; for, under the circumstances described in this petition, the company could no longer use, with safety to itself and the public, the track which leads to the coal-chute, and would have to move the coal-chute itself. See also, in this connection, *City of Atlanta* v. *Ga. R. &c. Co.*, 148 *Ga.* 635 (98 S. E. 83). Under this decision and our construction of the charter of the City of Moultrie, quoted above, we are of the opinion that whether or not the making of the crossing will create another use which is inconsistent with the use to which the strip of land in-

volved has already been appropriated should be determined under evidence properly submitted at a trial of the case upon its merits.

*Judgment reversed. All the Justices concur, except Russell, C. J., who dissents.*